UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER SNOOK, *et al.*,

      Plaintiffs,

v.

INTERNATIONAL UNION UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, LOCAL 602;
INTERNATIONAL UNION UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA; and
GENERAL MOTORS,

      Defendants.

Case No.  2:15-cv-10622
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [34, 35]**

---

With the ratification of the 2007 collective bargaining agreement, a new two-tier wage structure was introduced at General Motors. Under the 2007 CBA, employees hired to perform "non-core" jobs were paid lower, entry-level wages while other employees were paid higher, traditional wages. Not long after the CBA was ratified, some senior GM employees voiced concern over non-core workers making less because they wanted to transition into these less physically demanding non-core jobs at traditional pay. Defendant International Union United Automobile, Aerospace, and Agricultural Implement Workers of America ("International UAW") brought this issue to the attention of GM and, in March 2008, GM and the International UAW entered into agreements that they claim changed who would be paid entry-level wages. In particular, GM and International UAW claim that the March 2008 agreements permitted GM to

hire a predetermined number of employees at the entry-level wage—regardless of the type of work performed.

Plaintiffs are 23 current or former employees of GM whom GM paid entry-level wages. They maintain that the March 2008 agreements did not modify the 2007 CBA's provision that only those working non-core jobs would be paid entry-level wages. As Plaintiffs performed only core work, they contend that GM breached the 2007 CBA by paying them entry-level wages. Plaintiffs further claim that International UAW, and their local union, Local 602 of the International UAW, should have done more to contest GM's payment of entry-level wages to those performing core work. For these and other reasons, Plaintiffs sued GM, International UAW, and Local 602.

Before the Court is a motion for summary judgment filed by GM and another filed by the Unions. Having reviewed the parties' extensive briefing and having heard oral argument, the Court will GRANT Defendants' motions for the reasons set forth below.

## I.

## A.

In January 2007, Plaintiffs were hired as temporary employees at GM's Lansing Delta Township facility ("LDT" or "Lansing") at a wage of about $18 an hour. (*See e.g.*, R. 35, PID 1129.) Plaintiffs claim (but Defendants dispute) that they were being paid under Paragraph 98 of the 2003 GM-UAW collective bargaining agreement. (R. 1, ¶ 7; R. 35, PID 915.) Under that paragraph, employees' wages gradually progressed to about $28 an hour after about three years on the job. (R. 1, ¶ 7) Moreover, Paragraph 98 provided that if employees left GM but were brought back within a year, they would continue in their wage progression instead of starting over. (R. 1, ¶ 7.)

In the fall of 2007, a new GM-UAW collective bargaining agreement was up for ratification. A "FAQs" flyer stated that if the new CBA was ratified, 500 temporary employees at Lansing would be hired as permanent employees if they were still employed on January 2, 2008. (R. 38, PID 2379.) Another informational document ("Temps & New National Agreement") stated that temporaries then employed at Lansing would not be impacted by the "two tier wage system." (R. 38, PID 2381.)

The referenced two-tiered wage system was a product of negotiations between GM and the International UAW. GM had contemplated outsourcing over 16,000 so-called "non-core" jobs to better compete with Japanese automakers. (*See* R. 35, PID 1033–34, 2120.) The International UAW, however, fought to retain these jobs in house. (*See* R. 35, PID 1034, 2120.) Ultimately, the International UAW "agreed to a competitive wage for non-core work in return for an outsourcing moratorium." (R. 35, PID 2120.)

The 2007 GM-UAW collective bargaining agreement ("2007 CBA") was ratified with an effective date of October 15, 2007. (R. 35, PID 971.) As most relevant to this case, it memorialized the two-tier wage structure. In particular, Paragraph 98 of the 2007 CBA paid traditional wages and provided for traditional progression. (*See* R. 1, ¶ 7; R. 35, PID 915; R. 35, PID 985–86.) But the 2007 CBA also included a document titled "Memorandum of Understanding UAW-GM Entry Level Wage & Benefit Agreement" ("Entry Level MOU"). The terms of the Entry Level MOU applied to all "entry level employees," which the MOU defined as "regular employees hired on or after the date of this Memorandum into the non-core work functions identified on Attachment A of this Memorandum." (R. 35, PID 1006.) Attachment A identified work functions such as machining, sub-assembly, and inspection. (R. 35, PID 1010.) Significantly, the Entry Level MOU set forth its own starting wage and progression for the

3

employees it covered—a wage and progression lower than that of Paragraph 98. It is undisputed that Plaintiffs were not hired into and were not assigned to the "non-core work functions" identified in the Entry Level MOU.

The 2007 CBA also included "Document 162," which provided (consistent with the "FAQs" flyer) that 500 temporaries at Lansing would be made permanent—if "still working at Lansing Delta Township on 1/2/08." (R. 35, PID 1015.)

It appears that sometime in the fall of 2007, GM no longer required (or could no longer sustain) a third shift at Lansing. Just a week after the 2007 CBA was ratified, GM wrote a letter to the International UAW stating that GM planned to eliminate the third shift and lay off 510 regular employees and all 500 temporary employees at Lansing. (R. 35, PID 1179.)

Upset that these layoffs would occur during the holidays, Steve Bramos, then the Bargaining Chairman of Local 602, requested a meeting with GM and the International UAW. (R. 35, PID 1112.) Apparently as a result of this meeting, on October 25, 2007, the International UAW and GM entered a memorandum of understanding regarding the Lansing temporaries ("October 2007 MOU"). Under this MOU, the third shift at Lansing would cease on December 21, 2007. (R. 35, PID 1181.) But temporaries at Lansing would receive holiday pay. (*Id.*) The October 2007 MOU further provided that temporaries would be required to return on January 2, 2008 (to help with transitioning) and would be "released at the point their services are no longer required, no earlier than January 4, 2008 and no later than January 31, 2008." (*Id.*) Most significant to this case, the MOU rescinded the permanent-hire promise of Document 162 (for the 500 temporaries still employed on January 2, 2008): "It is agreed that as they relate to LDT, the terms of the letter entitled, 'Temporary Employee Placement,' [Document 162] contained in the 2007 [CBA] are superseded by this understanding and hereby waived." (*Id.*)

4

On November 7, 2007, Bramos held a Local 602 meeting to explain the reduction in force. (*See* R. 35, PID 1213.) Meeting minutes indicate that the terms of the October 2007 MOU were discussed, including the fact that the MOU "supersede[d]" the commitment to hire temporaries on January 2, 2008 as contemplated by Document 162. (*Id.*)

Plaintiff Andrea Kilmartin (and others) approached Bramos about filing a grievance, though it is unclear whether she did so before or after the November 7 meeting or whether she even attended the meeting. (R. 35, PID 1111.) At his deposition, Bramos stated that he did not file a grievance because "[t]here was no [contract] violation." (R. 35, PID 1111.) He elaborated: "Temporary employees are at will, quote, they [are] consider[ed] at-will employees, and none of them were hired. They never acquired any seniority; so based on the numbers that were given on how many people [GM was] hiring, they actually fulfilled that numbers obligation." (R. 35, PID 1111.)

Consistent with the October 2007 MOU, Plaintiffs were released in January 2008. By that time Plaintiffs' wages had progressed to about $22 an hour. (*See* R. 35, PID 1129, 1746.)

**B.**

Given that the Entry Level MOU of the 2007 CBA provided that GM could pay new employees hired into non-core job functions less than traditional wages, senior GM employees (making traditional wages) became concerned that they would not be able to transition to these job functions. (R. 35, PID 1843.) Yet these non-core jobs were desired by many senior employees as they were generally less physically taxing than others. (R. 35, PID 1843, 2120.) So union officials began receiving complaints from senior GM employees.

According to then International UAW Assistant Director Mike Grimes, the International UAW thus took the following position with GM: "As long as you got a number, why does it

5

matter where the employee's at? . . . As long as you got the number of non-core jobs, why does it matter where they work?" (R. 35, PID 1843.)

Arthur Schwartz, then the Director of Labor Relations for GM and one of the individuals involved in the creation and implementation of the core and non-core structure (R. 35, PID 1032), recalled the situation similarly. He agreed that the unions' position was that senior employees wanted the less demanding, non-core jobs but did not want a reduction in pay. (R. 35, PID 1036.) Schwartz testified that the issue "was eventually resolved with the two March [2008] memoranda . . . by saying that anyone who goes into the plant as a new hire is going to be entry level." (R. 35, PID 1035.)

One of the two negotiated documents referenced by Schwartz was the "Core/Non Core and Entry Level Job Assignment Clarification" executed on March 3, 2008 ("March 2008 Clarification"). (R. 35, PID 1947.) That one-page document provided that seniority employees would be "eligible to exercise their seniority rights for non-core jobs," that GM and the International UAW (and its locals) would determine the "number of non core jobs at each facility," and that once the "job placement of seniority employees ha[d] been exhausted" for a particular facility, and there were openings for new hires at the facility, GM would be able to hire "entry level" employees to fill those openings "up to the number of non core jobs" that had been determined for that facility. (R. 35, PID 1947.)

The second March 2008 document is the "Core/Non-Core Agreement" ("March 2008 Agreement), which was executed by Grimes and Schwartz on March 28, 2008. (R. 35, PID 1949–52.) (Grimes and Schwartz did not sign the March 2008 Clarification and the parties apparently did not depose its signatories.) The March 2008 Agreement states that it is "applicable only to those Non-Core and Temporary Employees hired into other-than-skilled-

6

positions." (R. 35, PID 1949.) The March 2008 Agreement included a conversion table from traditional to "non-core new hire" wages for temporaries hired as regular employees after the date of the agreement. (R. 35, PID 1949.) The agreement also identified the number of "non-core" jobs at Lansing: 448. (R. 35, PID 1951.)

## C.

Around June 2008, GM rehired Plaintiffs as temporary employees—at a rate of only $14 an hour as opposed to the $22 per hour they had been making when they were laid off in January 2008. (*See* R. 35, PID 1666, 1746.)

In July 2008, GM offered Plaintiffs regular employment. In particular, GM presented Plaintiffs with a form titled "Application for Temporary Employees to Entry Level Regular Employment." (*See e.g.*, R. 35, PID 1975.) The application stated: "Upon becoming a regular entry level employee, I understand that[] I will continue to receive the entry level wage rate and continue in my current wage progression." (*See e.g.*, *id.*)

Although all Plaintiffs signed the application, several Plaintiffs testified that they were told, or at least understood, that if they did not accept regular employment, they would be terminated immediately. (R. 35, PID 1359, 1615, 1675.) No officials of the Unions represented Plaintiffs at the signing of the regular-employment application. (*See* R. 35, PID 1343, 1359.)

Plaintiff Jennifer Snook testified that around this time she talked with Local 602 committeemen about her lower wage and was told that they would get back to her. (R. 35, PID 1667.) But, said Snook, she never heard anything: "Every time they came by I'd ask the same thing, [and they said,] 'We're still looking into it.'" (R. 35, PID 1667.)

In July or August 2008, Plaintiff Andrea Kilmartin also inquired about her wages and Paragraph 98. She asked Bramos (the Local 602 chairman) "why were we working next to

someone who is performing the same job and making a third more than we were, if not double what we were?" (R. 35, PID 1388.) Kilmartin recalls that Bramos informed her that they "can't file a grievance against the union." (R. 35, PID 1388.)

Kilmartin and Snook were also told that even though they were not made traditional employees, they would be soon enough. Specifically, Kilmartin's plant manager told her that because a lot of people were retiring due to GM's Special Attrition Plan, they would "all be traditional within a month or two." (R. 35, PID 1344.) Snook testified that someone from Local 602 provided her with a similar assurance. (R. 35, PID 1700.)

In October 2008, Kilmartin approached Bramos again; according to Kilmartin, Bramos said: "You can't file a grievance against the union, and it's a union deal." (R. 35, PID 1345.)

In February 2009, Kilmartin approached Joe Wills, a Local 602 committeeman, about grieving entry-level pay. (R. 35, PID 1346.) According to Kilmartin, Wills said the same as Bramos: "Can't file a grievance against the union." (R. 35, PID 1346.)

In October 2009, Kilmartin again met with Bramos. Kilmartin's personal notes about the meeting state: "Steve [Bramos] went into this big explanation how busy they were and how they saved so many jobs, yadda yadda yadda. Still working on it. Probably be next contract. Wait 'til I tell everyone that one." (R. 35, PID 1348.)

It appears that between late 2009 and late 2010, Plaintiffs did not actively pursue the wage issue. (*See* R. 35, PID 1349.) Kilmartin did recall "probably" talking to another Local 602 committeeman sometime in 2010. (The committeeman said the same as Bramos, that no grievance could be filed against the Unions.) Plaintiffs, however, cite no evidence of other complaints until November 2010.

**D.**

In November 2010, a GM employee approached Kilmartin and Snook about an issue that prompted them to look into why they were being classified as "non-core" in GM's computer system (PeopleSoft). The employee had sought medical treatment, but because she was coded as "non-core" in GM's system, the medical staff believed that the employee was not performing a physically demanding core job, and thus did not provide her with a work restriction. (*See* R. 35, PID 1349.) This employee then approached Kilmartin and Snook, who in turn went to see their group leader. (R. 35, PID 1349.) The group leader indicated that they had been coded differently in the system and instructed that they go talk with Jill Ploughman, then the GM labor relations representative at Lansing. (R. 35, PID 1349, 1589.)

According to a timeline prepared by Snook and Kilmartin, Ploughman stated, "Two Tier is the same as noncore!!," "You are all noncore workers @ LDT," and "Your pay is correct[.]" (R. 38, PID 2405.)

Kilmartin and Snook continued to pursue the issue through the remainder of 2010 and into 2011. For instance, in December 2010, Kilmartin and Snook (and the employee who had sought medical treatment) met with two Local 602 committeemen and discussed "coding, the classification." (R. 35, PID 1353.) The response from the Local 602 officials was that they lacked the power to change the classification and that they believed that only the International UAW had authority to do so. (R. 35, PID 1353.) In January 2011, Kilmartin or Snook (or both) met with Local 602 President Brian Fredline, "and discussed the entire situation and problems, even leading back to the non hiring of all the temps in 2007." (R. 38, PID 2406.) Fredline delivered their documentation to Bryan Czape at the International UAW (*Id.*) Possibly because

Fredline was promoted to the regional office soon thereafter, Snook and Kilmartin's repeated follow-up calls to Fredline went unanswered. (*Id.*)

**E.**

In May 2011, Richard Martinez took Bramos' position as the Bargaining Chairman of Local 602.

At one of the first Local 602 meetings following Martinez's election, Kilmartin raised the issue of their status as non-traditional employees. (*See* R. 35, PID 2046; R. 38, PID 2407.) Martinez then met with Kilmartin and Snook to get a better understanding of the issue. (R. 35, PID 2046; R. 38, PID 2407.) (Martinez had not been a member of Local 602 and had not worked at Lansing. (*See* R. 35, PID 2047.)) Martinez testified, "My conclusion from my research was . . . I couldn't from a position of local, the Local 602 chairperson, remedy their problems. I couldn't fix what happened in the past or I couldn't address what they thought they heard or what they did hear." (R. 35, PID 2049.)

Martinez, did, however, help Kilmartin and Snook prepare a letter to the International UAW on Local 602 letterhead. The July 2011 letter read it part, "There are approximately 110 members who are still employed as 2-tier, though they were active on January 2, 2008. These members were told from their hire date that the 2-Tier would only be temporary as language in the National Agreement would be utilized to bring them to the 'traditional employee' designation with full wages and benefits." (R. 35, PID 2061.)

In August 2011, Czape from the International UAW responded to Kilmartin and Snook. His letter explained that although GM had planned to layoff over 1,000 Lansing employees effective November 21, 2007, the International UAW and GM had reached an agreement to delay the layoff for a few weeks and provide Lansing workers holiday pay. (R. 35, PID 2063.)

10

Czape further explained that the October 2007 MOU "waive[d] the hiring requirements as defined in the letter titled 'Temporary Employee Placement,'" i.e., Document 162. (R. 35, PID 2064.)

## F.

Sometime in 2011 (perhaps in the fall), Kilmartin became concerned about the fact that she and others were identified as "non-core" on seniority lists posted in the Lansing facility. She brought the issue to Martinez's attention. (*See* R. 35, PID 2047.) The Local 602 chairman understood Kilmartin's issue to be about something other than wages: "They didn't really talk about because [non-core is] on [the lists] we're getting less money or benefits. They just didn't want another member to walk up and see their name on the seniority list and have the word noncore. It was really we don't want that visual representation of us being deemed by the company noncore or tier two or whatever it may be." (R. 35, PID 2047.) Although it is unclear whether she conveyed her understanding to Martinez, Kilmartin apparently viewed the list issue as connected with the computer-system-coding issue and entry-level-wage issue. (R. 35, PID 1370.)

On February 7, 2012, Kilmartin wrote a grievance that was filed on her behalf by a Local 602 committeeman. (*See* R. 35, PID 2119.) Kilmartin wrote, "Nature of Grievance[:] I protest mangmt putin 2 tier employees on the seniority list as non-core employees[.] I demand mgt. to fix this problem w/ people soft so all employees are listed correctly—we do not have non core employees. Been like this [illegible] 2007" (R. 35, PID 2066.)

On May 3, 2012, Ploughman (from GM labor relations) responded to Kilmartin's grievance. Ploughman wrote, "On next seniority list printed[,] non-core will be removed. (This is the seniority lists that are posted in the plant.[)]" (R. 35, PID 1682, 2067.)

Kilmartin attempted to get Local 602 to appeal. She wrote, "I am submitting this for appeal due to the fact that the settlement in no way satisfies the elements or demands of the grievance." (R. 35, PID 2069.) At a May 2012 member meeting, Local 602 voted down Kilmartin's appeal. (R. 35, PID 2086.) This was done so that Kilmartin could appeal to the International UAW, as members believed that the issue was beyond Local 602. (*See* R. 35, PID 2090.)

In June 2012, Kilmartin, with the signatures of the plaintiffs in this case, appealed to the International Executive Board. (*See* R. 35, PID 2089.) Kilmartin wrote, "The settlement simply states that Management will not print 'Non-Core' on the seniority list. This does not in any way rectify the injustice or satisfy the grievance. . . . We perform jobs on the production line (and always have) and deserve to be classified as such! The Non-Core classification affects our pay, benefits and seniority." (*Id.*)

In October 2013, the Executive Board dismissed the appeal. (R. 35, PID 2105.) The Board believed that, as filed, the scope of Kilmartin's grievance was limited to the printing of non-core on the seniority lists and that Ploughman's response spoke "to the demand of the grievance." (*Id.*) The Board explained that an appeal could not be used to "rewrite or supplement a written grievance." (*Id.*)

Kilmartin then appealed to the Public Review Board (R. 35, PID 2108)—an independent group of four professors from various backgrounds including law and labor relations (R. 1, PID 9; R. 38, PID 279). On behalf of the plaintiffs in this case, Kilmartin took the position that their hire in July 2008 at entry-level pay violated Paragraph 98 of the 2007 CBA. (R. 35, PID 2118.) Kilmartin maintained that they should have continued in their wage progression from where they had left off in January 2008. (R. 35, PID 2118.) Although acknowledging that they had signed

the applications for regular employment at entry level wages, Kilmartin argued that they had no other option and that "we were told that the classification would only be temporary." (R. 35, PID 2119.)

During their initial review of Kilmartin's appeal, the Public Review Board could not determine "the contractual basis" for the International UAW's position and sought clarification of the "core" and "non-core" concepts from the International UAW. (R. 35, PID 2117.) In response to the Board's request, Grimes prepared a memorandum explaining that "the National Parties reached an agreement on March 3, 2008, under which the terms 'core' and 'non-core' no longer referred to the work being performed." (R. 35, PID 2117.) Grimes provided the Public Review Board with a copy of the March 2008 Clarification—it had not previously been part of the record before the Board. (*Id.*)

On October 6, 2014, the Public Review Board issued its opinion denying Kilmartin's appeal. The Board acknowledged the International UAW's explanation that "after the 2007 Agreement was ratified, the parties abandoned the idea of basing the lower wage rate on job assignments, but they retained the term 'non-core' to describe the number of jobs at each location that would be limited to entry level wages." (R. 35, PID 2124.) The Board concluded, "Now that it has been explained, the decision to protect the right of high seniority employees to continue to perform the non-core jobs that were saved through the [outsourcing] moratorium makes sense." (R. 35, PID 2124.)

But the Board was critical of the Unions' conduct. The Board wrote, "we can understand appellants' perplexity at the information they received from the local union and the International Union's dismissal of their concerns." (R. 35, PID 2124.) In the Board's opinion, "no one at the local union seemed to understand that the designation 'non-core' no longer related to job

13

assignment" and that the International UAW's "at times interchangeable use of the terms 'non-core' and 'tier 2'" was "unfortunate and confusing." (R. 35, PID 2125.) "Notwithstanding the complexity of the parties' negotiations," opined the Board, "the UAW's represented employees [were] entitled to a timely and comprehensible explanation of the contractual basis for their wages and benefits. Appellants did not receive that." (*Id.*) Nonetheless, the Board denied Plaintiffs' appeal because "the union's failure to conduct an investigation" could not be the basis for relief under the collective bargaining agreement. (*Id.*)

## G.

About four months after the Public Review Board's decision, on February 18, 2015, Plaintiffs filed this lawsuit against GM, Local 602, and the International UAW. (*See* R. 1.) Plaintiffs' complaint sets forth numerous claims in the form of three counts. Under Count I, Plaintiffs forward a "hybrid § 301" theory, claiming primarily that GM breached the 2007 CBA in paying them entry-level wages and that the Unions breached their duty to represent them regarding their wages. (*See* R. 1, PID 12.) In Count II, Plaintiffs pursue, on various grounds, a stand-alone, breach-of-representation theory against the Unions. (R. 1, PID 13.) And in Count III, Plaintiffs assert that the Unions committed fraud under Michigan law. (R. 1, PID 13.)

In June 2015, this Court stayed this case pending the Sixth Circuit's decision in a similar case. In *Dragomier v. Local 1112 UAW*, employees at GM's Lordstown facility brought a hybrid § 301 claim alleging that GM breached the 2007 CBA by paying them entry-level wages and that their unions failed to investigate or grieve that breach. *See* 620 F. App'x 517, 521 (6th Cir. 2015). In resolving that claim, the Sixth Circuit did not directly address the breach-of-contract question, instead disposing of the hybrid claim by concluding that the unions did not violate the duty of fair representation. *Id.* at 526.

In November 2015, this Court lifted the stay and the parties completed considerable discovery.

Defendants now seek summary judgment on all claims. (*See* R. 34, 35.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

## A.

The Court first addresses three of Plaintiffs' claims that do not warrant merits determination because they were not adequately pled in Plaintiffs' complaint.

## 1.

In their summary-judgment response brief, Plaintiffs claim that the International UAW violated the duty of fair representation by entering into the October 2007 MOU, the March 2008 Clarification, and the March 2008 Agreement. (*See* R. 38, PID 2361.) Plaintiffs say that because these documents purported to modify the 2007 CBA, the UAW constitution required ratification from union members. (*Id.*) As there was no ratification of these documents, it follows, Plaintiffs imply, that the Unions did not fairly represent them in executing the documents. (*See id.*) Plaintiffs also assert that the failure to obtain ratification means that the three documents are "null and void." (*See* R. 38, PID 2360–61.)

The Court declines to reach the merits of these claims. As Defendants point out in their summary-judgment reply briefs, Plaintiffs did not plead in their complaint that the Unions failed to comply with the UAW constitution by signing the October 2007 MOU and the two March

2008 documents. (*See* R. 39, PID 2448 n.4, 2450; R. 40, PID 2456 n.5, 2457.) And a summary-judgment response brief is not the proper place to raise a new claim or novel theory of the case. *See Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 667 (6th Cir. 2012); *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005).

Regarding their claim about the failure to ratify the October 2007 MOU, Plaintiffs do ask to amend their complaint. (R. 38, PID 58.) But this too is procedurally improper. A response brief is the wrong venue to make a motion. E.D. Mich. LR App'x, ECF R. 5(e); *see also Hansen v. AM Gen., LLC*, No. 13-CV-12750, 2014 WL 6686767, at *9 (E.D. Mich. Nov. 26, 2014) (Michelson, J.).

And even if the Court were to entertain Plaintiffs' request to amend, it would not grant it. It appears that the notion that the October 2007 MOU and the two March 2008 documents are contrary to the UAW constitution is based on facts already known to Plaintiffs at the time they filed this suit. This inference is particularly strong given that Plaintiffs' counsel had already fully litigated the factually-similar *Dragomier* case before filing this case. At oral argument, Plaintiffs tried to rebut this inference by arguing that the October 2007 MOU only came to light during discovery in this case. But the record reflects that Snook and Kilmartin learned about the October 2007 MOU in August 2011 when Czape responded to their letter (*see* R. 35, PID 2063–64) and that they received a copy of that MOU in January 2012 (R. 38, PID 2408). Allowing Plaintiffs to amend on a theory that should have been apparent at the time they filed their complaint—after discovery is closed and after they have reviewed Defendants' summary-judgment briefing— would be unfair to Defendants. *Cf. Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986) (explaining that while mere delay in seeking leave to amend is not enough to deny the request, "some significant showing of prejudice to the opponent" suffices).

16

**2.**

Although raised in the context of a fair-representation claim against the Unions, Plaintiffs assert that GM breached the 2007 CBA by not making them permanent employees as of October 15, 2007. (R. 38, PID 2355–56.) In particular, Plaintiffs say that "[t]he UAW knew or should have known that GM violated the 2007 CBA by failing to hire plaintiffs as permanent employees as of October 15, 2007[.]" (R. 38, PID 2355–56.) Apparently, the contract language supporting this claim of breach is Document 162 of the 2007 CBA: it provided that 500 temporaries at Lansing would be made permanent employees with a seniority date of October 15, 2007—if they were still employed on January 2, 2008. (*See* R. 35, PID 1015.)

The Court again agrees with the Unions that Plaintiffs did not plead this breach theory in their complaint. (*See* R. 40, PID 2456 n. 5.) As discussed, the October 2007 MOU unambiguously "waived" and "superseded" the terms of Document 162. (R. 35, PID 1181.) Thus, Plaintiffs' claim of breach of Document 162 must be based on a claim that the October 2007 MOU was invalid. But the only manner in which Plaintiffs make this claim is by saying that the October 2007 MOU needed a union ratification vote. And, as just explained, this theory was not pled in the complaint. As such, Plaintiffs' claim that GM breached the terms of Document 162 is also not properly before the Court.

**3.**

Plaintiffs assert that "GM unilaterally altered the terms of the CBA by having the plaintiffs 'agree' to what amounted to a permanent reduction in wages, benefits and seniority . . . when they were hired as permanent employees without any agreement by the union to modify the CBA[.]" (*See* R. 38, PID 2354–55.) "This," say Plaintiffs, "constitute[d] an unlawful

unilateral change in the CBA as it relates to the terms and conditions of [their] employment." (R. 38, PID 2355.)

The Court again concludes that this claim was not adequately raised in the complaint. As an initial matter, the only mention in the complaint of a "unilateral change" in the conditions of Plaintiffs' employment appears in an allegation against the Unions—not GM: "The *union* had an obligation to investigate the source of [the July 2008 Applications for Temporary Employees to Entry Level Regular Employment] and to grieve both the documents and the circumstances in which they were signed, i.e., the fact that the [forms] constituted a unilateral change in the terms and conditions of plaintiffs' employment[.]" (R. 1, ¶ 18 (emphasis added).) It is questionable that this passing reference to a "unilateral change" was enough to give GM fair notice that Plaintiffs were claiming that it unilaterally altered the 2007 CBA by forcing them to sign the applications for regular employment.

And even if the reference was enough, a key premise of this claim is not adequately pled in the complaint. It is plain from the face of the October 2007 MOU, the March 2008 Clarification, and the March 2008 Agreement, that *both* GM and the International UAW signed those documents. (R. 35, PID 1181, 1947, 1950.) And it is those documents that Defendants say justified the terms of Plaintiffs' regular employment in July 2008. It thus appears that Plaintiffs' claim that GM unilaterally amended the 2007 CBA is based on their claim that the three documents were ineffective absent ratification. But again, the ratification theory was not raised in the complaint. It follows that Plaintiffs' claim that GM unilaterally altered the 2007 CBA was also inadequately pled.

**B.**

The Court now turns to what appears to be Plaintiffs' central claim in this case: that, upon their rehire as temporaries in June 2008 or upon their hire as regular employees in July 2008, GM breached the 2007 CBA by paying them entry-level wages and the Unions failed to adequately investigate or grieve GM's payment of entry-level wages. (*See* R. 38, PID 2353–57.)

This "hybrid" claim is brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. To recover on a hybrid § 301 claim, "the union member must prove both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Garrish v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir. 2005). The union member's failure to prove either prong means that the hybrid § 301 claim fails against both the company and the union. *Id.*

As will be explained, the Court finds that no reasonable jury could conclude that GM breached the 2007 CBA. As such, it does not address the fair-representation prong of Plaintiffs' § 301 claim. *See Vencl v. Int'l Union of Operating Engineers, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998) ("If the union member fails to prove that the employer breached the collective bargaining agreement . . . the union member's grievance would have failed regardless of the union's representation.").

Collective-bargaining agreements are interpreted "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M & G Polymers USA, LLC v. Tackett*, — U.S. —, 135 S. Ct. 926, 933 (2015). This means that "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (internal quotation marks

omitted). And if those words are ambiguous, extrinsic evidence may reveal the intentions of the parties. *See Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204, 208–09 (6th Cir. 2016); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Gen. Motors, LLC*, 612 F. App'x 803, 808 (6th Cir. 2015) (finding that even if the text of the agreement was ambiguous, extrinsic evidence removed any ambiguity). Summary judgment is appropriate where every reasonable jury would agree on the parties' intent. *See Gen. Motors*, 612 F. App'x at 807; *Int'l Union, United Mine Workers of Am. v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003).

Plaintiffs' claim of breach is as follows. Under the Entry Level MOU of the 2007 CBA, the term "entry level employees" only includes employees performing non-core job functions. Neither the March 2008 Clarification nor the March 2008 Agreement modified this definition. Thus, at the time of their rehire as temporaries in June 2008 and at the time of their hire as regular employees in July 2008, the class of entry-level employees was still limited to those performing non-core work. Plaintiffs performed core work. Thus, Plaintiffs are not entry-level employees, and GM's payment of entry-level wages breached at least the traditional pay provisions (i.e., Paragraph 98) of the 2007 CBA. (*See* R. 38, PID 2353–54.)

Defendants' response is as follows. The March 2008 Clarification and the March 2008 Agreement modified the definition of "entry level employees" in the Entry Level MOU. In particular, those documents allowed GM to classify new hires as entry-level employees, regardless of whether the new hires would perform core or non-core work—so long as GM did not employ more entry-level employees at a facility than there were non-core jobs at that facility. (*See* R. 34, PID 289–92; R. 35, PID 913.)

The provisions of the March 2008 Clarification strongly favor Defendants' position. That agreement between GM and International UAW explicitly allowed for and contemplated several actions: (1) that a specific count or "number" of non-core jobs at each facility would be determined and recorded; (2) that seniority employees could (and would) "exercise their seniority rights for non-core jobs"; (3) that once the "hierarchy for job placement of seniority employees ha[d] been exhausted" at a facility, and there were job openings for new hires, GM could and would hire "entry level employee(s) to fill the opening(s) up to the *number* of non core jobs recorded at the facility"; and (4) that once the "number" of entry-level employees reached the "number" of non-core jobs "identified" at a facility, GM could hire a new entry-level employee and then the most senior entry-level employee would be bumped up to traditional. (R. 35, PID 1947 (emphasis added).)

Reading these provisions of the March 2008 Clarification together all but compels the understanding that GM could hire entry-level employees to perform either core or non-core jobs. Senior, traditional employees could take non-core jobs. Yet GM could hire up to a predetermined number of entry-level employees at a given facility, which was 448 in Lansing. So what would happen if, for example, 200 senior, traditional employees at Lansing took non-core jobs, i.e., jobs like machining, sub-assembly, and inspection? Although GM could hire 448 entry-level employees, there would be only 228 non-core jobs left at that facility. This means the other 200 entry-level employees would be hired into *core* work (at entry level wages). This possibility, clearly contemplated by the March 2008 Clarification, undercuts Plaintiffs' position that the non-core definition of "entry level employees" in the Entry Level MOU survived the March 2008 documents.

Two other aspects of the March 2008 Clarification further support Defendants' position. For one, it says, "As discussed in the Entry Level Wages and Benefits Subcommittee of those 2007 National Negotiations, it was clearly understood by the parties that: '*Transitioning the workforce may result in employees working together as either an entry level or non entry level employee*.'" (R. 35, PID 1947.) It also states, "During the transition period identified above, the assignment of entry level *and/or* traditional employees to core *and/or* non core jobs will be determined by the local occupational grouping agreement." (R. 35, PID 1947 (emphases added).) As the Sixth Circuit indicated in *Dragomier*, this "language would be arguably superfluous if the definition of 'entry level employee' remained limited to those employees performing only non-core work." 620 F. App'x at 526. The Court explained, "if GM's cost-cutting incentives led it to fill all non-core jobs with entry level employees and entry level employees performed only non-core work, entry level and traditional employees would not work together." *Id.* "Further," said the Court, "the use of 'and/or' in the second-mentioned provision suggests that both entry level and traditional employees can be assigned core functions." *Id.*; *see also Dragomier v. Local 1112 Int'l Union United Auto. Aerospace & Agr. Implement Workers of Am.*, 64 F. Supp. 3d 1033, 1049 (N.D. Ohio 2014).

Plaintiffs' rebuttal is not so much what the March 2008 documents say, but what they do not say. Plaintiffs point out that the documents do not explicitly state that the definition of "entry level employee" found in the Entry Level MOU of the 2007 CBA is amended or rescinded. (*See* R. 38, PID 2332–35, 2353.) And, Plaintiffs point out, in May 2009, GM and the International UAW entered into another MOU that was explicit. (R. 38, PID 2353–54.) The May 2009 MOU states that GM and the International UAW had agreed to make a number of "modifications" to

22

the Entry Level MOU, including that "[a]ll new production employees hired through [September 14, 2015] will be classified as entry level employees[.]" (R. 35, PID 1960.)

These are fair points. The March 2008 documents do not explicitly state, for example, "the definition of 'entry level employees' in the Entry Level MOU is modified as follows . . . ." And the May 2009 MOU is more explicit in that regard. Further, if the March 2008 documents already allowed GM to classify all new hires as entry level, why did the May 2009 MOU also need to "modif[y]" the Entry Level MOU?

One answer to this last question might be that the May 2009 MOU operated to extend the terms of the March 2008 documents through September 14, 2015, and, in that sense, was a "modification." And it is noteworthy that the May 2009 MOU served to "modif[y]" the prior agreements in at least one other significant way: it removed the cap on the number of entry-level employees (e.g., 448 at Lansing) to permit GM to hire any number of such employees. (R. 35, PID 1960.)

Moreover, the May 2009 MOU is extrinsic evidence. And if the Court were to look to that type of evidence to divine the parties' intent in March 2008, it would find most persuasive the events that led to the drafting of the March 2008 documents.

It is undisputed that following the ratification of the 2007 CBA, senior employees at GM expressed concern about lower-paid new hires cornering the market for the less physically taxing, non-core jobs. As Grimes (then the International UAW Assistant Director) testified: "[W]e started getting a lot of pressure from the traditional employees, because they wanted to move around in the plant . . . . [T]hey didn't want to spend 30 years on the assembly line." (R. 35, PID 1843.) Similarly, when Schwartz (then the Director of Labor Relations for GM) was asked, "So the pushback from the union side was 'You've got people that have been in the

23

position, they've been working for the company for a long time, they want to start taking the easier jobs'—which would be the non-core jobs—'and not have a reduction in pay,'" Schwartz testified, "Correct." (R. 35, PID 1036.)

And both Grimes' and Schwartz's testimony is consistent with what was done to address this issue. Grimes explained that International UAW took the following position with GM: "As long as you [GM] got a number [of positions that can be paid entry level wages], why does it matter where the employee's at? . . . As long as you got the number of non-core jobs [that can be paid entry level wages], why does it matter where they [senior employees] work? So . . . we ended up allowing the employees to work wherever in the plant." (R. 35, PID 1843.)

Schwartz similarly testified:

> [the unions wanted to] come off the core and non-core [concept] and have a number by plant. And their rationale was the number [of entry-level workers] will be the same as it would have been [under the core/non-core concept], so what do you [GM] care? We originally said, "Well, you know, it's easier to rationalize why we're paying people different amounts of money if they're on different jobs." But at the end of the day we made the agreement that we would move into this thing. Because it did accomplish what we wanted to accomplish, which was to try and have a more competitive cost situation.

(R. 35, PID 1039.) Schwartz added that the issue "was eventually resolved with the two March [2008] memoranda . . . by saying that anyone who goes into the plant as a new hire is going to be entry level. And the whole core/non-core kind of disappeared." (R. 35, PID 1035.)

In other words, both Grimes and Schwartz testified that to satisfy the demands of senior employees wanting non-core jobs at traditional wages, while also satisfying GM's need to pay a group of employees lower wages, GM and the International UAW agreed to move away from paying entry-level wages to those hired to perform non-core jobs to allowing GM to hire employees as "entry level" up to the number of non-core jobs. This allowed GM to pay the same number of employees entry-level wages as under the original function-based definition while

satisfying the International UAW that its senior members could transition to non-core jobs. This undisputed extrinsic evidence lends strong support to this Court's understanding of the text of the March 2008 Clarification.

Plaintiffs also claim that the question of whether the Entry Level MOU's definition of "entry level employees" survived the March 2008 documents is one for the jury by pointing to other parts of Grimes' and Schwartz's testimony. As for Grimes, Plaintiffs cite this testimony:

> A      . . . And if you're not above your number, anybody that comes in the work force is entry level[.]
>
> Q      But [the March 2008 Clarification] doesn't really say that, does it?
>
> A      It says that.
>
> Q      Where does it say that?
>
> A      Well, it doesn't really say that. It just says, [quotes from March 2008 Clarification.]
>
> Q      . . . But it doesn't say anywhere in [the March 2008 Clarification] [that] entry level is now defined as anybody who's hired into the company, regardless of job function, does it?
>
> A      Yeah.
>
> Q      It says that?
>
> A      Yeah. It says it to me.
>
> Q      That's your interpretation, correct?
>
> A      Yeah.

(R. 35, PID 1849, 1851; *see also* R. 38, PID 2332–33.) As for Schwartz, Plaintiffs cite the following:

> Q      Is there something in these [March 2008] documents or in any document that specifically says the original conception of the Core/Non-Core Agreement is rescinded?
>
> A      Specifically those words?
>
> Q      Yes.
>
> A      No. But it's implied by the movement to the numbers on Attachment A [of the March 2008 Agreement]. . . .

Q     There's nothing explicit in either [the March 2008 Clarification or March 2008 Agreement] that rescinds or renounces the language used in the [Entry Level MOU of the 2007 CBA], correct?

A     There is nothing in the language. It was the understanding between the parties that because we were going to a number, that eliminated the whole non-core definition. . . .

Q     Well, how come you didn't just say that? . . . Wouldn't it have been just easier to say somewhere 'These documents supersede and rescind the definition of entry level employee, because they're no long tied to being non-core'?

A     Well, I'm assuming that's a rhetorical question, because I can't go back in time and do it. . . .

Q     Well, let me ask you this. Was there ever any discussion that you were involved in to the effect of 'This language and what we're trying to do is not as clear as it could be. We really need to put something in here that specifically supercedes or renounces our definition of entry level?

A     As long as the parties were in agreement, we didn't see a problem. No.

(R. 35, PID 1040, 1054–55; *see also* R. 38, PID 2234–35.)

This testimony does not create a genuine issue of material fact as to whether GM breached the 2007 CBA by paying Plaintiffs entry-level wages. The essence of this testimony is that while the March 2008 documents did not explicitly state that GM and the International UAW were rescinding the definition in the Entry Level MOU, the language used and the sequence of events contemplated by the March 2008 documents required that understanding.

At oral argument, Plaintiffs argued—without citing any contract language—that because they were already in GM's system, in that they were temporaries who had been recalled, the March 2008 documents did not apply to them. Perhaps, in making this argument, Plaintiffs refer to the fact that March 2008 Clarification says that GM could pay "new hires" entry-level wages. (*See* R. 35, PID 1947.)

The Court does not find this argument persuasive. At oral argument, Defendants explained that once Plaintiffs were laid off in January 2008, Plaintiffs retained no status in GM's system. Defendants supported their explanation with reference to Paragraph 56 of the 2007 CBA.

26

That provision reads in part, "Employees shall be regarded as temporary employees until their names have been placed on the seniority list. There shall be no responsibility for the reemployment of temporary employees if they are laid off or discharged during this period." (R. 35, PID 983.) Plaintiffs were not placed on the seniority list prior to their layoff in January 2008. Thus, under Paragraph 56, GM could never have recalled Plaintiffs. As such, the Court is hard pressed to see how, when they were recalled, Plaintiffs were different from any other person with respect to whether they were "new hires" under the March 2008 Clarification.

In sum, the Court believes that the text of the March 2008 agreements, at least when coupled with an understanding of their purpose (accommodating senior GM employees while allowing GM to reduce costs), would compel every reasonable jury to conclude that the March 2008 documents amended the "entry level employees" definition in the Entry Level MOU to allow GM to hire an employee to perform core work at an entry-level wage. And that is just what happened to Plaintiffs. As such, their breach-of-contract claim against GM based on entry-level pay fails as a matter of law. It follows that their hybrid § 301 claim against all Defendants based entry-level pay fails as a matter of law.[1]

## C.

Count II of Plaintiffs' complaint is a stand-alone, breach-of-the-duty-of-representation claim brought pursuant to 28 U.S.C. § 1337 and § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a). (R. 1, PID 13.)

Plaintiffs may pursue this legal theory only as far as it is not based on an assertion that GM breached the CBA. This is because "to establish a § 9(a) claim, a plaintiff need only show

---

[1] The Court acknowledges that Defendants have made a strong claim that Plaintiffs' § 301 claims are untimely. Because the Court believes that the breach-of-contract question quite plainly did not warrant a jury's resolution, it has declined to address the more factual statute-of-limitations question.

that the union breached its duty of fair representation, and not that there was also a violation of the collective bargaining agreement." *Summers v. Keebler Co.*, 133 F. App'x 249, 252 (6th Cir. 2005) (citing *Pratt v. United Auto., Aerospace and Agric. Implement Workers of Am., Local 1435*, 939 F.2d 385, 389 (6th Cir. 1991)). So to allow Plaintiffs to bring claims under § 159(a) that are based on GM's breach of the CBA, would be to allow Plaintiffs to circumvent the dual proof requirements of a hybrid § 301 claim. *See id.* "Thus, where a plaintiff's complaint states a 'colorable claim' under the collective bargaining agreement, it must be construed as a § 301 claim rather than a § 9(a) claim." *Id.*; *accord Vencl v. Int'l Union of Operating Engineers, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998).

Given this law, the Court first determines which of Plaintiffs' fair-representation claims may be pursued via § 159(a). Although their complaint and briefing is not always clear in this regard, it appears that Plaintiffs believe the Unions breached the duty of representation in five ways: (1) by failing to investigate or grieve GM's payment of entry-level wages; (2) by entering into the October 2007 MOU, the March 2008 Clarification, and the March 2008 Agreement without a ratification vote (R. 38, PID 2361); (3) by making false promises prior to the ratification of the 2007 CBA (*see* R. 1, ¶ 15; R. 38, PID 2317–18); (4) by failing to adequately represent them in connection with their offers for regular employment in July 2008 (R. 1, PID 6–7,11); and (5) by taking or failing to take certain actions during the processing of the 2012 grievance (*see* R. 1, PID 10–11; R. 38, PID 2359–60).

The Court will only address three of these claims under § 159(a). The first claim is based on GM's alleged breach of the CBA so it is not a proper § 159(a) claim. (And the § 301 version of the claim has been addressed.) The second claim is not, as explained, adequately pled in the complaint. The third claim, that the Unions said things to induce Plaintiffs to ratify the 2007

28

CBA, is related to GM's alleged breach insofar as the Unions' statements were based on then-existing language in the CBA. Even so, the Court will assume in Plaintiffs' favor that they may pursue that fair-representation claim under § 159(a). The same is true with the fifth claim: given the PRB's opinion, the Unions' conduct during the 2012 grievance process is arguably related to a claim that GM breached the CBA. But in *Dragomier*, the Sixth Circuit indicated that a similar claim might be pursued via § 159(a). *See* 620 F. App'x at 527. So the Court will also assume the fifth claim is a proper § 159(a) claim. As for the fourth claim, the Court explains below that it is partly a proper § 159(a) claim. The Court thus examines these latter three fair-representation claims under § 159(a).

To prove a breach of the duty of fair representation, Plaintiffs must show that the Unions' acts or omissions "were arbitrary, discriminatory, or in bad faith." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (citing *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (internal quotation marks omitted).

## 1.

Although it is unclear whether Plaintiffs intended to bring this claim under § 159(a), Plaintiffs do say that to induce them to ratify the 2007 CBA, the Unions "promise[d] that they would be hired as permanent employees in their current wage progression and that any cut in pay for temps as a result of the new two-tier wage structure would not affect them." (R. 38, PID 2317–18; *see also* R. 1, ¶ 15.)

In support of this assertion, Plaintiffs cite several documents distributed before the ratification vote on the 2007 CBA. (R. 38, PID 2318.) A flyer titled "2007 National Agreement[:] Just the FAQs" stated, "If ratified, approximately 220 current LDT Temps would be hired as permanent employees with a seniority date of September 4, 2007[;] Approximately 500 current Temps employed at LDT who are still employed at LDT as of January, 2, 2008 will be hired as permanent employees with a plant seniority date of September 24, 2007." (R. 38, PID 2379.) Another pre-ratification document exclaimed (by using all caps) that current temporaries at Lansing would not be impacted by the two-tier wage system. (R. 38, PID 2380; *see also* R. 38, PID 2382.) Even Bramos testified that it was his take that "whatever the non-core that they were referencing was," there were no such jobs at Lansing. (R. 35, PID 1108.) Plaintiffs say that these statements proved to be false. (*See* R. 38, PID 2322, 2324–25.)

Plaintiffs are correct—because of the subsequent October 2007 MOU and the two March 2008 agreements, these pre-ratification statements did not come to fruition. Plaintiffs were not hired as regular employees on January 2, 2008. And Plaintiffs were, ultimately, impacted by the two-tier wage system.

But this does not mean that a reasonable jury could find that the Unions breached their duty to adequately represent Plaintiffs. This is because Plaintiffs cite not a single piece of evidence indicating that when the Unions made these statements, they lacked a reasonable basis for them. As for the promise of permanent employment on January 2, 2008, Plaintiffs cite no evidence that anyone who made that promise knew—prior to the ratification of the 2007 CBA— that GM would eliminate the third shift at Lansing. And Plaintiffs cite no evidence that anyone who made that promise knew—prior to the ratification of the 2007 CBA—that senior, traditional employees would balk at new hires performing non-core jobs at entry-level wages. As such,

Plaintiffs have not identified evidence that would allow a reasonable jury to find that the Unions' promises were made arbitrarily or in bad faith. *See Garrison*, 334 F.3d at 538.

**2.**

Plaintiffs also claim that the Unions failed to adequately represent them in connection with their offers for regular employment in July 2008. (*See* R. 1, PID 6–7, 11.) Plaintiffs assert that the Unions "had an obligation to investigate the source of [the applications for regular employment] and to grieve both the [applications] and the circumstances in which they were signed, i.e., the fact that the [application] forms constituted a unilateral change in the terms and conditions of plaintiffs' employment and the fact that plaintiffs were forced to sign documents that resulted in a reduction in pay or else face the loss of their jobs." (R. 1, ¶ 18.) Plaintiffs also complain that they lacked union representation at the signing meeting and that union officials failed to "offer any guidance or advice to plaintiffs on whether to sign the documents." (R. 1, ¶¶ 16, 17, 34.) Plaintiffs also claim that the Unions falsely assured them that after they signed their regular-employment applications, they would be moved from entry-level to traditional "within one or two months." (R. 1, ¶ 16.)

Some of these claims are not proper § 159(a) claims. Although vague, Plaintiffs' claim that the Unions should have investigated the "source" of the applications is apparently premised on the notion that, had the Unions done so, they would have discovered that the terms of the employment application were contrary to the 2007 CBA. The same is true with Plaintiffs' claim that the Unions should have grieved the "unilateral change in the terms and conditions of plaintiffs' employment"—that assertion is logically premised on a claim that GM breached the 2007 CBA. (Or it is a claim that the MOUs subsequent to the 2007 CBA required ratification; if so, the Court has explained why it is not addressing that claim.) As such, these two claims cannot

31

be pursued under § 159(a). And to the extent Plaintiffs have pursued these claims under § 301, the Court addressed them above.

As for the other claims based on the Unions' representation during Plaintiffs' transition from temporary to regular employees, they are plainly time barred by the applicable six-month statute of limitations. *See Adkins v. Int'l Union of Elec., Radio & Mach. Workers*, AFL-CIO-CLC, 769 F.2d 330, 335 (6th Cir. 1985) (providing that six-month statute of limitations applies to all fair-representation claims); *Johnson v. Int'l Bhd. of Teamsters, Local 380*, No. 06-3699, 2007 WL 775604, at *4 (E.D. Pa. Mar. 8, 2007) (stating that six-month statute of limitations applies to both "pure" and hybrid fair-representation claims). If the Unions' failure to be present at the signing was failure to represent, then the factual basis for that claim was obvious at the time of the signing, i.e., in July 2008. The same is true for the Unions' failure to offer Plaintiffs advice on whether to sign—that occurred before or at the signing. As for any promises by the Unions that Plaintiffs would transition from entry-level to traditional status "within one or two months," it should have been obvious within a few months of the signing that no such transition was forthcoming. So that claim accrued at least by the end of 2008. Yet this suit was filed in 2015. Similarly, any reasonable union member acting with due diligence would have known that the Unions were not going to contest the take-it-or-be-terminated nature of GM's regular-employment offer within a few months of the offer. Again, this suit was filed over six years later.

Accordingly, Plaintiffs' claims based on the Unions' representation in connection with their signing of the regular-employment applications fail as a matter of law.

### 3.

Plaintiffs also assert a § 159(a) fair-representation claim based on the Unions' conduct during the processing of the 2012 grievance. Plaintiffs assert, "The union also failed to present

32

critical information on the grievants' behalf, made misrepresentations to grievants and to the internal appeals boards, failed to present favorable arguments on grievants' behalf (and in fact opposed grievants at the internal appeals boards) and changed their positions from the internal appeals to what is being presented in federal court." (R. 38, PID 2359–60.)

All but one of these claims are too bare to be presented to the jury (and, as will be explained below, the exception fails for another reason). Plaintiffs detail no misrepresentations the Unions made to the IEB or PRB. And other than those already addressed, Plaintiffs do not specify any misrepresentations the Unions made to them. Nor do Plaintiffs say which "favorable arguments" should have been made to the IEB or PRB but were not. Similarly, Plaintiffs fail to specify which positions the Unions took during the grievance process that were different than before this Court. Notably, the International UAW argued before the PRB that the March 2008 documents modified the definition of "entry level employee" in the Entry Level MOU of the 2007 CBA (*see* R. 35, PID 2117–18, 2120–22) and that is the very argument they make here. Finally, Plaintiffs cite no authority for the proposition that a union breaches its duty of fair representation by taking a position contrary to union members when the union believes that its conduct is supported by the collective bargaining agreement.

The Court noted an exception because, in their complaint, Plaintiffs flesh out one thing they believe was improperly withheld by the Unions during the grievance process: the March 2008 documents. (*See* R. 1, ¶¶ 31–32.) But the Sixth Circuit rejected this argument in *Dragomier*. True, the Court thought the argument too underdeveloped to warrant addressing. But the Court of Appeals also reasoned: "Appellants cite no case law supporting the notion that a union breaches its duty of fair representation by failing to timely disclose documents supporting its position during either the decision making timeframe or the period of internal appeals.

33

Moreover, for the reasons stated by the district court, the Unions' failures to turn over the Entry Level MOU and 2008 clarifying documents did not amount to a breach of the duty of fair representation." 620 F. App'x at 527–28; *see also Dragomier v. Local 1112 Int'l Union United Auto. Aerospace & Agr. Implement Workers of Am.*, 64 F. Supp. 3d 1033, 1060 (N.D. Ohio 2014) ("[T]he March 2008 Clarification would not have assisted Plaintiffs' appeal, as it supports the Unions' position that Plaintiffs were properly hired as Entry Level employees and therefore their grievance request lacked merit."). Plaintiffs have not provided a good reason for departing from this aspect of the Sixth Circuit's and the district court's decisions in *Dragomier*. (*See* R. 38, PID 2373–74.) As such, Plaintiffs' claim that the Unions did not timely produce the March 2008 documents should not be presented to a jury.

### D.

In Count III, Plaintiffs claim that the Unions committed fraud in violation of Michigan law. (R. 1, PID 13–14.) Recognizing that their complaint may have been unclear as to the factual basis of this claim, Plaintiffs clarify in their summary-judgment response that they are alleging that the Unions committed fraud by making promises to induce them to ratify the 2007 CBA. (R. 38, PID 2375.) In particular, Plaintiffs claim that the Unions promised permanent employment as of January 2, 2008 and that the two-tier wage structure would not affect them. (*Id.*)

The Unions respond that federal law preempts Plaintiffs' state-law fraud claim. (R. 35, PID 922–93.) Although their motion could be clearer, the Unions appear to rely on the National Labor Relations Act for their preemption argument. (*See id.* (citing cases that discuss § 9(a) of the NLRA).)

Although the issue is not straightforward, courts have found that the NLRA preempts claims similar to Plaintiffs' claim of fraud. *See Baize v. Philip Morris Inc.*, 120 F. App'x 576,

34

579–80 (6th Cir. 2004) (finding that state-law fraud claim based on assurances that factory would not close was preempted by § 8 of the NLRA); *Walsh v. Int'l Bhd. of Elec. Workers (I.B.E.W.) Local 503*, 62 F. Supp. 3d 300, 303 (S.D.N.Y. 2014) ("Plaintiffs' [state-law] fraudulent misrepresentation and breach of fiduciary duty claims are subsumed by the [NLRA's duty of fair representation] because the alleged acts here (that defendants made certain misrepresentations regarding CBA negotiations to the union's membership), if ultimately proven, would violate this already-existing duty."); *Daugherty v. Int'l Union*, No. 3:08-0695, 2010 WL 1408784, at *1, *5 (M.D. Tenn. Mar. 31, 2010) (finding that state-law claims of fraud and misrepresentation based on union officials' statements about the benefits of retiring were preempted by the NLRA); *Banks v. Alexander*, 493 F. Supp. 2d 1008, 1015 (S.D. Ohio 2007) (finding that state-law claims based on union official's failure to pass on plaintiffs' workplace suggestions to employer was preempted by the NLRA).

In support of their argument against preemption, Plaintiffs cite only *Alongi v. Ford Motor Co.*, 386 F.3d 716 (6th Cir. 2004). But *Alongi* does not help Plaintiffs. In that case, the Sixth Circuit found that § 301 of the Labor Management Relations Act did not preempt the plaintiffs' claim of fraud. *Id.* at 726. But the Unions here do not claim preemption under § 301 of the LMRA—they invoke the NLRA. And the scope of NLRA preemption is not the same as § 301 preemption. *See id.* at 723; *see also Walsh*, 62 F. Supp. 3d at 303.

Based on what the parties have placed before the Court, the Court finds that Plaintiffs' fraud claim is preempted by the NLRA.

## IV.

It may be that this litigation could have been avoided had Local 602 or the International UAW more thoroughly explained to Plaintiffs the contractual basis allowing General Motors to

pay entry-level wages to those performing core jobs. Indeed, during her deposition, Snook was asked whether she understood that "the UAW and GM [had] negotiated an agreement to change how non-core was defined so it's not linked to job assignments"; she answered, "I do now." (R. 35, PID 1681.) Even so, for the reasons provided at length, Plaintiffs have not presented a viable claim against the Unions or GM. As such Defendants are entitled to summary judgment on all the claims of Plaintiffs' complaint. A separate judgment will issue.

     SO ORDERED.

s/Laurie J. Michelson      
LAURIE J. MICHELSON

Dated: February 2, 2017          U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

     The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 2, 2017.

s/Keisha Jackson     
Case Manager